## COURT OF APPEALS.

THOMAS D. GREEN, respondent agt. WILLIAM H. SHUMWAY
and DAMON COATES, impleaded with FRANCIS A. THAYER,
appellants.

The provision in the act to provide for a convention to revise and amend the consti-
tution of this state, passed March 29, 1867, which requires of an elector, when
challenged, the following oath : "I (A. B.) do solemnly swear (or affirm) that I
have never voluntarily borne arms against the United States since I have been a
citizen thereof; that I have voluntarily given no aid, countenance, counsel or
encouragement to persons engaged in armed hostility thereto ; that I have neither
sought, nor accepted, nor attempted to exercise the functions of any office what-
ever, under any authority or pretended authority, in hostility to the United States;
that I have not yielded a voluntary support to any pretended government, autho-
rity, power or constitution, within the United States, hostile or inimical thereto ;
and did not willfully desert from the military or naval service of the United
States, or leave this state to avoid a draft, during the late rebellion ;" is *unconsti-
tutional and void.*

*September Term,* 1868.

APPEAL from judgment of general term of the sixth dis-
trict, reversing judgment in favor of defendants.

The complaint alleged that, pursuant to the constitution
of the state of New York, and an act of the legislature,
passed in March, 1867, a lawful election was held through-
out the state on the 23d day of April, 1867, for the purpose
of choosing delegates to meet in convention at the capitol,
on the first Tuesday of June, 1867, to revise the constitu-
tion of the state, and to amend the same.

That each qualified elector was entitled to vote for dele-
gates at large, and for delegates chosen in the senatorial dis-
trict in which he might reside.  That the plaintiff was a
native-born, white citizen, of full age, and a resident of the
third ward of the city of Syracuse, which constitutes an
election district.  That the defendants were inspectors of
election for said ward ; that the plaintiff was a duly qualified
elector in said district, on the 23d day of April, 1867, and
entitled to vote; that after the defendants had entered upon

the duties of their office as inspector, and had duly opened the polls of such election on the day aforesaid, the plaintiff offered to vote, and presented a ballot for that purpose, and requested the defendants to receive the same; that the defendants fully intended to deprive him of his rights and franchises as a citizen, refused to receive the ballot so offered, and would not and did not permit the plaintiff to vote at the election; and claims one thousand dollars damage.

The answer of the defendants, Shumway and Coates, who appeared, recites and alleges that by the said act of the legislature of this state, mentioned and referred to in said complaint, the qualifications of electors for the election of senatorial delegates and delegates at large, to meet in convention to revise and amend the constitution, is prescribed, with the provision that no person shall vote at said election who will not, if duly challenged, take and subscribe the following oath, to wit: "I (A. B.) do solemnly swear (or affirm) that I have never voluntarily borne arms against the United States since I have been a citizen thereof; that I have voluntarily given no aid, countenance, counsel or encouragement to persons engaged in armed hostility thereto; that I have neither sought, nor accepted, nor attempted to exercise the functions of any office whatever, under any authority or pretended authority, in hostility to the United States; that I have not yielded a voluntary support to any pretended government, authority, power or constitution, within the United States, hostile or inimical thereto; and did not willfully desert from the military or naval service of the United States, or leave this state to avoid a draft, during the late rebellion."

The defendants then allege that at the time of the offering of his said ballots for the election of said delegates, the plaintiff was duly challenged as an elector of said district, and required to take and subscribe the oath aforesaid; that the oath was read to him, and he refused to take and subscribe the same, and upon such refusal the defendants refused to

Green agt. Shumway.

receive the ballot and deposit the same in the boxes pre-
pared for that purpose, because the plaintiff thus refused, and
returned same to him. They aver that such refusal to
receive and deposit the ballot was made for the purpose of
discharging their duty as such inspectors, under the act
referred to, and ask for a dismissal of complaint. The plain-
tiff demurred to the answer. The special term, upon argu-
ment, sustained the demurrer, and ordered that the com-
plaint be dismissed, with costs. Upon appeal to the general
term, the order of the special term was reversed, and judg-
ment ordered for the plaintiff on the demurrer and the
assessment of damages, with leave to amend. The damages
were stipulated at fifty dollars; and the defendants appealed
to this court.

The case was submitted on printed points.

DEFENDANTS, *in person.*
GEORGE F. COMSTOCK, *for plaintiff.*

MILLER, J. This case involves the constitutional validity
of that portion of the act to provide for a convention to
revise and amend the constitution of this state which excludes
from the privilege of voting all who refuse to take the test
oath prescribed by the act in question. (*S. L. of* 1867, *ch.*
194, § 2, *p.* 287.)

I think that the oath in question was unconstitutional and
invalid, for the reasons which I will proceed to state. The
first subdivision of the tenth section of the first article of the
constitution of the United States provides that "no state
shall pass any bill of attainder, *ex post facto* law, or laws,
impairing the obligations of contracts, or grant any title of
nobility." The provision of the act which is to be consid-
ered declares that no person shall vote at the election for
delegates to said convention who will not, if duly chal-
lenged, take and subscribe an oath that he has not done cer-
tain acts mentioned therein, and inflicts the penalty of polit-

ical disfranchisement, without any preliminary examination or trial, for a refusal to take said oath. By this enactment the citizen is deprived, upon declining to conform to its mandate, of a right guaranteed to him by the constitution and the laws of the land, and one of the most inestimable and invaluable privileges of a free government. There can be no doubt, I think, that to deprive a citizen of the privilege of exercising the elective franchise, for any conduct of which he has previously been guilty, is to inflict a punishment for the act done. It imposes upon him a severe penalty, which interferes with his privileges as a citizen, affects his respectability and standing in the community, degrades him in the estimation of his fellow men, and reduces him below the level of those who constitute the great body of the people of which the government is composed. It moreover inflicts a penalty which, by the laws of this state, is a part of the punishment inflicted for a felony, and which follows conviction for such a crime. It is one of the peculiar characteristics of our free institutions, that every citizen is permitted to enjoy certain rights and privileges, which places him upon an equality with his neighbors. Any law which takes away or abridges these rights, or suspends their exercise, is not only an infringement upon their enjoyment, but an actual punishment. That such is the practical effect of the test oath required by the act in question can admit of no doubt, in my judgment. It arbitrarily and summarily, and without any of the forms of law, punishes for an offense created by the law itself.

In the formation of our national constitution, its framers designed to prevent and guard against the exercise of the power of the legislature, by usurping judicial functions, and for the punishment of alleged offenses in advance of trial, for offenses unknown to the law, and by bill of attainder and *ex post facto enactments.*

Laws of this character were considered as among the most mischievous and vicious class of judicial legislation, and in

England were made the instruments of gross abuse, and a tremendous engine of political power. Resorted to in times of high political excitement, they were the means of inflicting great wrong and injustice. They sometimes affected the dead as well as the living, and were the instruments of transcendent iniquity. (*Dwarris, part I,* 254; *part II,* 712; 2 *Story on Constitution,* §§ 13 *and* 44.) In a free government such legislation could not be endured; and hence it was that the constitution so emphatically prohibited it.

When the act in question was passed by the legislature, there was no law in this state which condemned or characterized the conduct which is punished in this act by depriving the citizen of the right of suffrage. This law created a new crime, and makes an offense which did not previously exist. It punishes for an act which was not a crime when committed. But even if the alleged offenses incorporated in the oath prescribed were known to the law, the statute in question, in violation of the rules of the common law, pronounces judgment of condemnation, without evidence, without any opportunity to defend against the charge, and without a trial. It makes the party the accuser of himself, and his refusal to acquit himself for any cause his own condemnation. It punishes for an offense before an accusation is made and a trial had judicially, according to the constitution and the laws of the land. It compels him, in direct violation of the fifth amendment of the constitution of the United States, "to be a witness against himself." His refusal to testify that he is innocent operates to produce his conviction, and seals his guilt. The object of the fifth amendment last cited was to prevent the party from being called upon as a witness of his own guilt, and to insure to him a full and fair trial by due process of law. To compel him to testify would violate this provision; and indirectly to make a refusal to testify a cause for punishment, effects the very same purpose. It is only an evasion of the provision cited, to condemn a person for a refusal to swear to innocence.

That the federal constitution is violated by the provision of the act to which I have referred, I entertain no doubt. It is essentially, in the particulars indicated, both a bill of attainder, or of pains and penalties, and an *ex post facto* law. We are not without authority to sustain the views I have expressed, and the subject has recently undergone a thorough discussion and examination in the supreme court of the United States, so as to render further elaboration entirely needless. In *Cummings* agt. *The State of Missouri* (4 *Wal.* 277), a bill of attainder is defined to be a legislative act which inflicts punishment without a judicial trial. FIELD, J., who delivered the opinion of the court, remarks, "If the punishment be less than death, the act is termed a bill of pains and penalties. Within the meaning of the constitution, bills of attainder include bills of pains and penalties. In these cases the legislative body, in addition to its legitimate functions, exercises the powers and office of judge; it assumes, in the language in the text books, judicial magistracy; it pronounces upon the guilt of the party, without any of the forms or safeguards of trial; it determines the sufficiency of the proofs produced, whether conformable to the rules of evidence or otherwise; and it fixes the degree of punishment in accordance with its own notions of the enormity of the offense." The learned judge cites cases from British history, where bills of this character had been passed, and the court held that the second article of the constitution of the state of Missouri, which required a test oath from priests and clergymen, in order that they might continue in the exercise of their profession, and be allowed to preach and teach, constituted a bill of attainder, within the meaning of the provision of the federal constitution prohibiting the states from passing bills of that character.

The court also held that the clauses of the same article, in depriving priests and clergymen of the right to preach and teach, impose a penalty for some acts which were innocent at the time they were committed, and increase the penalty

prescribed for such of the acts specified as at the time constituted public offenses, and in both particulars violate the provisions of the federal constitution prohibiting the passage by the states of an *ex post facto* law. That they further violated that provision in altering the rules of evidence with respect to the proof of the acts specified; thus, in assuming guilt instead of the innocence of the parties, in requiring them to establish their innocence, instead of requiring the government to prove their guilt, and in declaring that their innocence can be shown only in one way, by an expurgatory oath. The learned judge, in reference to the clause of the constitution which inhibits the passage of an *ex post facto* law, says: "By an *ex post facto* law is meant one which imposes a punishment for an act which is not punishable at the time it was committed, or imposes additional punishment to that then prescribed, or changes the rule of evidence by which less or different evidence is sufficient to convict than was required." (*See also Calder* agt. *Bull*, 3 *Dallas*, 380, 390; *Fletcher* agt. *Peck*, 3 *Cranch.* 137.) It is clearly manifest that the law under consideration was liable to the objection that it was both a bill of pains and penalties and an *ex post facto* law, within the principles laid down in the case cited. It not only inflicted pains and penalties, but it imposed punishment for acts not punishable at the time they were committed, and changed the rule of evidence as to the testimony required to convict.

In *Ex parte Garland* (4 *Wal.* 333) a similar question was presented, and it was held that an act of congress which excludes from practicing in the federal courts any attorney or counsellor who refuses to take a test oath precisely like the oath required by the provisions of the act in question, with the exception of the last clause, relating to desertion, partakes of the nature of a bill of pains and penalties, and is subject to the constitutional inhibition against the passage of bills of attainder, under which general designation bills of pains and penalties are included; and that in the exclusion

Green agt. Shumway.

which the act adjudges, it imposes a punishment for some of the acts specified, which were not punishable at the time they were committed; and for other of the acts, it adds a new punishment to that before prescribed, and it is thus within the inhibition of the constitution against the passage of an *ex post facto* law.

Independent of any views which may be entertained, the cases cited cover the question discussed, and are decisive and controlling. Any further discussion would therefore be unnecessary. But it is not inappropriate to add that all oaths of an expurgatory character, especially when applied as a means of punishment for past acts, not at the time recognized and known to the law as penal or criminal, have been regarded in all countries, in modern times, as odious and inquisitorial; and, passed as they usually are in times of high excitement, upon the return of cool judgment and calm reason, have been condemned and repealed by legislative enactment. Such was the case in our own state, after the termination of the revolutionary struggle. Some laws of such a character had been passed during that period, and even after its close, when peace had returned, rigid enactments were made, which excluded from the legal profession many eminent lawyers of that generation. A more enlightened and liberal spirit, however, under the guidance of the most able statesmen and profound jurists of that day, finally prevailed, and those who had been banished from the country were allowed to return, restored to the privileges of citizenship, by the repeal of the disabling laws; and in one instance at least, where the party had the misfortune to differ from his neighbors and friends upon the great question of American independence, after years of absence and expatriation in a foreign land, was allowed to resume his former position in the legal profession, where his talents, extensive acquirements and profound learning shed lustre upon the jurisprudence of the state, and the purity and consistency

of his life to an advanced age commanded the respect, confidence and veneration of the entire community.

I am also of the opinion that the statute in question violates the constitution of the state of New York.

The first section of the second article of the constitution prescribes the qualifications of electors, who shall be entitled to vote "for all officers that now or hereafter may be elected by the people."

The second section of the thirteenth article provides for the submission of the question, whether a convention shall be called, "to the *electors qualified* to vote for members of the legislature, and in case a majority of the *electors so qualified*, voting at such election, shall decide in favor of such convention for such a purpose, the legislature shall provide for the election of delegates to such convention." This clause does not confer upon the legislature any power to create disabilities not existing at the time, under the constitution, or to restrict the right of suffrage which the constitution has established. It would be extraordinary if the legislature had the right to determine who were entitled to the privilege of voting, and thus, in the exercise of an unlimited discretion, be able to disfranchise any class of citizens, when the right is already clearly established. Such a power would be liable to the grossest abuse, dangerous in the extreme, and obviously was never intended to be conferred. It is evident, I think, that the above section, specifying the qualifications of electors to pass upon the question whether or not there shall be a convention, plainly imports that the same electors, and no others, are qualified to vote for delegates; and any disfranchisement of any portion of said electors is a violation of this section, and therefore void.

The statute also violates section one of article one of the constitution of this state, which declares that "no member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." The

"law of the land" does not mean a statute passed for the purpose of working the wrong, but the law which existed at the time when the alleged offense was perpetrated. The provision was intended to restrict the power of the legislature, and to prevent any act which would deprive a party of his rights or disfranchise him, until it was ascertained judicially that they had been forfeited· (*Wynehammer* agt. *The People*, 13 *N. Y. R.* 393, 394 *and* 416, *and other cases cited*.) The act in question pronounces a judgment and disfranchises the elector, without judge or jury, or any of the forms required by the ordinary course of legal proceedings.

It also violates section six of article one, which declares that no person shall be held to answer for a crime, except on presentment of a grand jury; and the second section of the same article, which secures the right of trial by jury in all cases in which it has heretofore been held inviolate.

These objections are too apparent to require an extended discussion. It is manifest that the case was properly decided by the general term, and the judgment reversing the judgment of the special term overruling the demurrer and dismissing the complaint must be affirmed, with costs.

All the judges concurred excepting HUNT, WOODRUFF and MASON.